Good morning. Good morning. Let's see, are you Ms. Wifald or Ms. Young? Verna Wifald on behalf of Vahe Dadyan. As I understand it, you two are going to divide your time, right? Yes. Ten minutes apiece? That's correct. And is anybody planning on any rebuttal time or how are you going to do this? Yes, I have already informed the clerk I would like three minutes for rebuttal. Okay, very good. All right, please proceed. Verna Wifald on behalf of Vahe Dadyan. I'd like to address the restitution issue. Please. Mr. Dadyan, unlike the other defendants in this case, he was he applied for a loan, $157,000 in his own name, for his own company. He did falsely state that he had 11 employees. He had no employees. We're not contesting his guilt on the claims, the three counts that involve those loans. However, in this case, the court assessed restitution $10 million, and the figure comes from the government spreadsheet. The government said that he joined the conspiracy on such-and-such a date, and then every single loan that was applied for by everybody else was attributable to him. Let me ask you this. As you know, we ask you to be prepared to argue whether, effectively, whether this court should adopt the standard of United States v. Dockage, the Seventh Circuit case, in our restitution jurisprudence. Could you comment on that, please? Yes, I would. I think we should. And I think that the Ninth Circuit Stoddard decision, basically, is in line with Dockage. And I think with the Dockages, because you have to start with the statute. Restitution is only permissible based upon 18 U.S.C. 366-3A, and then we have subsection 2 to make the victim whole. And it says, even if a conspiracy, any person directly harmed by the defendant's criminal conduct. And that's defendant apostrophe S, not defendance. So you don't think conspiracy plays any role in our analysis? Not in – well, sometimes it does. It depends upon the defendant's role in the conspiracy. If the defendant here is – and I understand that you also challenge the sufficiency of the evidence. Yes. But assuming that it was correct and the jury's verdict is upheld that he was a member of the conspiracy, then under the very statute that you cite, he would be responsible for all the harm caused by the conspiracy. Do you agree with that? No. The – it's the defendant's conduct, his own conduct. So in this particular case, the defendant's conduct, he clearly is responsible for the 157,000. The probation officer came up with a few more other, you know, bank accounts or whatever it is, but came up with only a million. And the government came up with 10 million. The difference is here, also under 3664, the district court is required to resolve the objections by a preponderance of the evidence, and the judge did not do that. Did you, in your argument before the trial court, go through why there was error and go through the figures and show where the errors lay? No. The trial attorney just said he was limited to his own conduct. However, the burden is on the government, and the government did not go through all those different banks. Well, the government provided a sheet. That's correct. There was the testimony, an exhibit, and it documented all of the loans and precisely what all the losses were with regard to all of the loans. Why isn't that sufficient? It's not sufficient because if you look, I mean, I'm looking at this the way I read the statute. It says the defendant's criminal conduct. And when you have a conspiracy, there's all kinds of defendants, and they all have a different role. But this case, I think, is particularly unique because everybody else applied for loans in phony names for phony businesses, and he did not do that. Practically speaking, what would happen if we did, in fact, adopt a rule in response to Judge Smith's question where you agreed that we should, the circuit should adopt a rule like Dogich that says that the loss calculations need to be the same or cannot be greater for the restitution than the sentencing. But we also adopt the position of the government along the lines of what Judge Ammon asked, which is that your client is responsible for the entire loss amount for the conspiracy. What does that mean for your client's sentence, which was based on a lower loss amount than the restitution? I mean, it's a little bit of a dangerous argument for you to be making here today to adopt Dogich when, in fact, your client's sentence may be higher if, in fact, that loss amount is adopted for both the restitution and for the sentencing guidelines. Well, I guess the thing is that we're arguing over what is the defendant's conduct and what is, I mean, you would have to find, and I did not see any case either under Dogich or any of the cases that were cited or in the Ninth Circuit that a defendant's restitution amount must be based upon the behavior of all of the other co-defendants. Well, for purposes of answering my question, assume that that is the case, that your client can, in fact, have attributable to him the losses for the entire scheme from all of the defendants based on the conspiracy. So you're asking me about the sentence? Correct. How does that correct into the sentence? Well, here, you know, I think it's important to point out, too, that although the government, excuse me, the district court went along, for the most part, with the government's calculation of the guidelines. But the government, the district court only imposed a sentence of one year and one day, substantially less than what the guidelines were assessed. So, I mean, even the district court recognized that his conduct was much less criminal than everybody else's. Right, so isn't this an example of, you know, looking a gift horse in the mouth? So, you know, that goes exactly to my point here, which is the district court did, in fact, give a much lower sentence than would otherwise be supported by the loss that was used for the restitution. Right, but the guidelines and restitution are two separate things. I mean, restitution can never be based upon what the guideline restitution is. It's based upon this statute here. But in Mr. Vahey's case, the loss was, for guidelines purposes, was actually much closer to the restitution figure than in the cases of the other defendants, correct? Well, the guideline, what the— Well, this is what's interesting. The district court assessed what the government asked, which was plus 20 under the loss. Then when they went and sentenced Mr. Richard Avazian, who was considered the ringleader, you know, he was absconded, so he was sentenced in absentia, but the court assessed his loss at only plus 16. And the government said, Well, you know, what about Vahey Dadian? And the judge said, Well, I think I made a mistake. But you're not appealing his sentence. Because, no, he's already served his sentence, yes. It would be moot. If you want to save any of your time, you may want to do that. Sure, I will. But when you come back— I will come back. I want to follow up on what my colleague pointed out because dockage, by my reading, suggests that the burden was on the defendant to show the error in the calculation that was before the district court. And as I understand, you said that didn't happen here. No. Right? It did not. Okay, well, think about that. And then when you come back, maybe help us with that. All right. Ms. Young, correct? Yes. Good morning, Your Honors. I'm Catherine Young from the Federal Public Defender's Office. On behalf of the appellant, Artur Evazian, I'd like to reserve three minutes for rebuttal, and I will watch the clock. Very well. Thank you. And the first issue I want to turn to is basically the facts of Mr. Artur Evazian's involvement because I think it reflects on a number of issues, including restitution, including insufficiency. And in this case, Mr. Artur Evazian applied for two loans. He had a legitimate business that preexisted the pandemic. He had a legitimate bank account for that business, and he had a legitimate ID. And he applied for two loans based on that. Now, the case against him was based upon items that were found on his phone and items that were found in a home office in his house. And there's no evidence that he used any of those items. With respect to the phone, there's no evidence when those items were placed on the phone, whether they were accessed during the conspiracy. So there's no evidence that those items were used in the conspiracy. Let me ask. I mean, is your best argument one about evidence? Is that what you're going to say, or do you have something to say about restitution and dockage? Well, I think it goes to one of the main points of restitution is we think it has to be limited to the defendant's conduct. Were you the trial lawyer or was someone else the trial lawyer? Someone else was. Okay. Did that trial lawyer specifically attack calculations in the amount that the government was proposing for restitution? The argument was made that basically our client had no knowledge of any of these other loans. So the primary argument, as I think, was they were beyond the scope of his involvement. With respect to challenging the specific. To even make that statement, you're discounting information that was on his phone. You're discounting information that was found in his house. Well, I wanted to – I was about to say that we don't know that those items were used, but we know from other evidence that the government produced that, in fact, he didn't have involvement. We know from the thousands of texts between the two primary conspirators, Tamara and Richard, we have their roadmap of what the conspiracy was. He may not have been as involved, but there was clearly sufficient evidence that he was involved. I mean, didn't he have information about an applicant A.D. that was on his phone and that was used in applications? Yeah. Our point was, though, that some of those items on the phone preexisted the conspiracy. So we don't know when the items came on the phone or whether they were accessed. They were also in the home office that belonged to his wife. He said that the items were placed on his phone by his wife, and I know the court doesn't have to credit his testimony. But the point that I wanted to make that I think is really compelling is if you look at those texts, thousands of texts over a period of seven months, laying out the entire conspiracy, what banks they're applying to, who they're using to go to the banks to create the documents. Well, one of them, they talk about using him to do things. They talk about him a few times, and it's never to do anything substantive. They say at one point, because Tamara had a bad back and sometimes she was immobilized,  twice they say they'll have him deposit a check. In both cases, ultimately, they make a wire deposit. So we didn't even do the things that they're chatting about and saying maybe he'll do. But, Counsel, with respect, people have complained about conspiracy laws for a long, long, long, long time. But they're very broad. They sweep a lot of people in, and that's the law we have. With respect, I think your argument about evidence and whether there's substantial evidence is not going to go very far. You can argue it all you want, but this is a conspiracy. It seems to me your client is well tied into it under the conspiracy law that we have. You can continue to argue it if you want, but maybe you want to focus on some of the other points that may be more compelling. It's up to you. Okay. Well, I won't then dwell on it, but I do want to say one of the things that resonated with me was the district court said in its order, citing Collazo, at a minimum, the government must show that each defendant knew the scope of the conspiracy and had reason to believe their own benefits were dependent upon the success of the entire conspiracy. And that's one thing that sets Mr. Ivasian apart. He wasn't part of the fraudulent documents and fraudulent bank accounts and fraudulent entities. Did he get any money? He got money from his own business, from his own business. And everything was legitimate at all the employees? No, no. We're not challenging that because the application did not accurately represent the nature of his business. It's a conspiracy. They all had the same plan. They used some of the same language. I think they might have even used some of the same phony employees. I mean, he got that, right? He has to know about that, though, or has to be deemed to know about it. And our point is he had his own business, and that was all the benefit he got. So why don't you address perhaps what might be your stronger argument, which is the evidence on the aggravated identity theft? Well, I think that's part of the whole thing. But the government has to prove he knew that the person was real. What do you think the evidence of that was? There's no evidence other than the ID was found on his phone. As I said, no evidence he used it, no evidence he even accessed it. He has to prove more than that he used the ID. He has to prove that he knew it was a real person. Exactly, and that's one of the arguments we made. The only thing they've shown is that it was on his phone. No further information that he used it, that he knew anything about her, or that he knew, and I know I'm swimming against the tide here, but no evidence that he knew what was going on. And the Dokich case I wanted to turn to for a minute, because I think, as Ms. Riefal said, that you have to show more than a conspiracy. You have to show that it was victimized directly by the defendant's criminal conduct. And that's the point we're making. These loans, we don't even know most of who the loans on the government's chart, we don't even know most of who they were submitted by. There's just, if there's some address on it or some name on it, it was all swept in. Do you agree that if we adopt Dokich as our standard, that your client and your co-counsel's client's counsel had an obligation to specifically object to errors that were in the restitution calculation? Do you agree with that? I don't know that Dokich says that. I mean, it does say the plain error standard. To that extent, there was an objection. There was an objection that we don't know anything about these loans. You can't just say there's an error in here. You've got to say there's an error here and here and here and here. And if you do that and you can show that, then Dokich says you can't go beyond that. But if you just say, hey, you know, there's some errors in here, that doesn't work, does it? You know, I'm not sure that Dokich says you have to specifically. I understood Dokich to be saying there was no objection at all. What then is the obligation of defense counsel under Dokich in terms of addressing errors in the retribution, if I'll call it, Excel sheet? Well, I think it's the government's burden, and there was an objection in this case. Not what Dokich says, is it? Well, to prove the loss, I think. The government's proven to prove the amount of the restitution claim. In this case, there was an objection by defense counsel saying there's no indication that these, some of these, all of these loans are connected to the conspiracy. Because some of them just had brief sort of descriptions. These were general comments. They weren't specific, right? They didn't go through and identify by line item. There was an overall objection to the fact that the government hadn't proved how these loans were connected to the conspiracy. And I see that I'm running out of my rebuttal time. So I just wanted to make one more point. That Dokich says the restitution should never exceed the loss used to calculate a sentence. So, in other words, if we were to go back, the court would have to reduce the restitution, not the loss. Okay. Very well. Thank you, Your Honor. Thank you for your time. All right. Mr. Lieberman, right? Yes. Good morning, Your Honors. Good morning. May it please the Court. Dave Lieberman for the United States. Both defendants have raised a number of sufficiency challenges. I am not going to address the sufficiency challenges vis-à-vis the conspiracy counts for the reasons based on some of the Court's questions unless the members of the panel have any concerns with respect to the conspiracy charges. With respect to Mr. Vahey, why don't you address that? That was a single loan. He doesn't have the same circumstances of items found in his apartment or things found on the phone. Why is that not more like Brown? What evidence do you have that suggests that he was aware of a larger conspiracy other than his individual participation in that loan? So can I make a legal point and a factual point? As a legal matter, even if we just looked at his loan, the evidence here would suffice to show a conspiracy. You have to show he's a member of the conspiracy. Yes. And I think we did. First, with respect to the Voyage Limo loan, his loan, we know the inputs. Let's look at the inputs and the outputs on that loan. The inputs, the IP records at trial connected, showed that Tamara assisted him in submitting that loan. The loan application itself also had the same information, false payroll numbers, that were connected to at least five other loans facilitated by Richard and Tamara. Look at the outputs of this loan. This is a $157,500 loan to his business. Nearly the entirety is liquidated out of his account and goes to entities controlled by co-conspirators. So just looking at that portion of the case alone shows his participation in concerted criminal action. The jury can well infer a conspiracy. Now let me lay on top of that the evidence of the money laundering, and this is something that the district court focused on, page 61, volume 1 of Vahe's excerpts. Given that Vahe was sending and receiving funds to and from multiple accounts, none of which belonged to Tamara Dadian, one of the leaders, it was reasonable for a juror to infer that Vahe knew that this was a conspiracy, that there were other members that were involved. The court can track all the loan proceeds out of his account. It goes to Runyon Tax Services, which was in the name of one of the foreign exchange students who had her identity stolen. It then goes to the Kalei La Primavera Home Purchase, which the trial evidence connects to Richard and his wife. And then after that, all those loan proceeds are dissipated. What happens next? The text messages. Vahe, according to Mark, wakes up and texts me, asking about where are his payments. So after his loan is entirely dispersed, he's asking for money. That shows his knowledge that this scheme extended beyond this one loan. And then he gets $50,000 of payments from a different entity, Timeline Transports, and it goes to a different bank account that he controls. And so given all of this engagement with numerous entities and other individuals who were not obviously Tamara, that shows or the jury could easily infer that this, he knowingly participated in a conspiracy and that the conspiracy stepped broader than this one loan and those proceeds. Can I briefly address Your Honor's question on the aggravated identity theft? Yes. And I'll talk about the direct evidence, but then also the fact that we have a Pinkerton theory on this as well with respect to Arthur. So he had, the trial evidence showed that Arthur had multiple identity documents from AD, a Social Security card and then two driver's licenses. Why couldn't they have all been fraudulent? So I think it's, take a look at, step back and look at the modus operandi of the scheme. They were, we know other conspirators were getting Social Security cards and visa documents and then connected to actual people and then using those to create the driver's licenses that were used in the loan application. And so I think it's a fair inference here that for AD that was the same, particularly given that we have the Social Security number, which was not used in the loan conspiracy, and then two additional driver's licenses on Arthur's phone with different women in the photographs, but the same identification. So a reasonable jury could infer that Arthur knew that this was a good identification. But my backup argument on this is the jury got a Pinkerton instruction with respect to, the jury could find, alternatively find Arthur guilty based on that liability. And even if Arthur did not directly know or understand that AD was a real person, it was certainly reasonably foreseeable to him as a member of the conspiracy in light of the fact that there were all these identification documents, not just of her but of other people, in his house and on his phone. And so even if he didn't do it, on his testimony he pinned the blame entirely on his wife Tamara. It was reasonably foreseeable, given all this stuff in his home and on his phone, for the jury to conclude that he understood that these were real people behind these identities. Unless there are any additional questions on the sufficiency portion, I would like to turn to the restitution issue. And I'll start by some questions that the panel asked, and then I'll turn to the Dovis question, which was the subject of this Court's order from last week. Judge Smith, you would post questions to both counsel about whether they specifically objected to the government's affidavit, which was basically a summary of voluminous records. And my recollection of the record is that they did not specifically attack specific loans in their connection to the conspiracy. Rather, they made a general objection and said, I should only be tagged with the loans that I personally were responsible for. Do you agree that if we adopt dokage, that the defendant in this case would have been required, instead of making a general objection, would have been required to specifically, if you will, point out errors, line items, if you will? Yes, I think that's right. So the District Court made factual findings. This is at Volume 1, Excerpts of Records 26 and 27 of Arthur's appendix. The District Court groups all the loans from the government's affidavit and makes findings and says some of these loans were undergirded substantive counts, some of these loans were submitted by co-conspirators, some of these loans were submitted using one of the aliases. If the defendants have to contest any of that, any of the portions of the affidavit, they needed to object at trial and say why the affidavit was wrong, and then we would do what we always do. We would have an adversarial presentation. We could bring in those bank records or wire transfer receipts with respect to the loans that are in dispute. I gather it's almost hornbook law that in restitution calculation where a conspiracy is involved that the aggregate of all the damage caused by all the conspirators gets swept in when you assign restitution requirements. That's correct, and that's what this Court said in the Riley case, a published decision that's been on the books for a while. Defendants who are convicted of conspiracy, they are vicariously liable for the foreseeable harms committed by their co-conspirators. And then the district court makes the two necessary findings that Riley requires on page 26 and 27. The court finds that each of the loans on the government's affidavit was within the scope of the conspiracy, and then the court also says that it has no doubt that a loan disbursed pursuant to a fraudulent application submitted by a co-conspirator would constitute a loss that directly and proximately resulted from the defendant's conspiracy. So that directly and proximately, that's a foreseeability finding. And so in light of this record, it's the defense burden, certainly on appeal, to say some of those findings were clearly erroneous and they have not done so, particularly in light of the fact that the jury's verdict mirrors what the district court held. As I mentioned previously with respect to we had a Pinkerton instruction here, the district court found each of these defendants guilty on substantive accounts, and as the government pointed out in our brief, some of those were entirely based on Pinkerton theories. And so the jury found that, at least at trial, that the loans presented at trial that co-conspirators submitted were within the scope of the conspiracy and reasonably foreseeable to each of these defendants. So from your perspective, complied with Riley, tied all of the co-conspirators together, they all get tagged with the total amount of loss, and then if we go with Dockage, there is a slight exception, and that is that if the defendants point out, express errors in the government's, in this case, declaration, that there would then be an adversarial hearing and that would get fleshed out, and to the degree there is error, then they would correct it there. Is that correct? That's correct, Your Honor. And the district court had the government's affidavit, and it explained, and the government explained our factual, basically factual summaries as to the connection. The affidavit was not, those descriptions were not specifically disputed. And then the district court makes factual findings comparing the affidavit, the loans on the affidavit, to specific trial evidence that it heard and to specific trial exhibits that it had received. How do you deal with the fact that, at least with Artur, there was such a vast discrepancy between what the court found as loss and what the court found as restitution? Because generally the principle is, with some exceptions of things that are included in restitution that aren't included in loss, that the figures should be the same. Yes, and I have two explanations for why the disparity was appropriate here. The first is if the, is the nature of the district court's factual findings at the sentencing with respect to the guidelines loss. This is at Volume 2, 187 and 188 of Arthur's excerpts. And if I could run through what the district court did there. The district court starts by saying that the loss associated with the scheme, the conspiracy, was at least $1.5 million. The district court then said that the government's factual position, that the loss was above $9.5 million, had some merit. The government might be able to prove by preponderance, in fact might be able to prove by clear and convincing evidence, that the loss was above $9.5 million. And then the district court doesn't engage that factual dispute. The district court says, I'm using $1.5 million because the loss at trial showed substantially more than that and cited a trial exhibit for a subset of the loans that had about $4 million plus. Well, you contended in the district court that the district court was wrong in calculating that loss. Is that still your position, that the district court was wrong? Yes. The district court committed procedural error vis-a-vis the government by not resolving our objection. But that procedural, and we haven't appealed that, but that procedural error by not resolving the government's factual position that the loss was above $9.5 million, that's an error that inured to the defendant's benefit. In our view, they got a windfall on the loss calculation. The fact remains that the district court never stepped forward at sentencing and made that final finding of what was the actual loss because there was no final resolution of that dispute at sentencing. Is he required to do that? In sentencing, the first thing you have to do is make an accurate guideline calculation. Isn't he required to resolve disputes and make an accurate guideline calculation? Yes, the judge is required to do that, and the judge's failure to grapple with the government's factual presentation there was procedural error that we, the government, could have appealed, but we haven't. My only point at this moment is that the record shows that the district court just made a single factual finding. The loss here was a floor, a minimum of $1.5 million. And then when the district court gets to restitution, it's restitution order, pages 26 and 27, volume 1 of Arthur's excerpts. It says, all right, I am now resolving certain complexities that I admittedly didn't resolve at sentencing because that question wasn't resolved at sentencing. Nothing that happened there tied the district court's hands in making an accurate loss calculation at restitution. And this brings me to my second reason why this disparity was appropriate here. Unlike in Dovich, where the sentencing and restitution occurred at the same hearing, based on the same record, the district court here followed the procedures in 18 U.S.C. 36-64-D-5. It scheduled a later restitution hearing, and the statute allows up to 90 days after sentencing. And then the statute also allows the parties in that period to submit evidence, or in this case, we submitted restitution briefs, which both sides further developed their legal arguments, their factual arguments, supporting their respective positions on restitution. So by the time we get to that restitution hearing, the district court has a different, but basically a more developed record of legal and factual arguments regarding the parties' respective positions. And then, in its order, credits the government's supplemental presentation and says it's $17 million for Arthur, $10 for Vahe. Based on your argument right now, and these two bases that you describe as being to justify the restitution award, do you agree then that the restitution award can, this issue can be resolved without us having to reach the argument that the other side asks us to resolve, which is to basically adopt a rule that says a restitution award can never exceed sentencing loss? Do we need to do that? I don't think you need to do that. I should point out that in our 20HA letter, we provided nozzles of an illustrative example where a restitution order did, in fact, exceed actual loss. So I don't think the court needs to reach it, but that statement from Dovich, a restitution should never exceed the loss used to calculate a sentence, I think that statement should be considered in light of the circumstances of Dovich. When a district judge is using the same record at the same hearing to calculate loss both under the guidelines and restitution. The Seventh Circuit in Dovich was quite sensibly confused. How can you have two different actual loss numbers if you're doing the same inquiry at the same hearing using the same record? In fact, in Dovich, the district court was unclear as to which loss it was using. Yes. And I think what's different in this case, and why I don't think that you need to reach it or why that rule would not reach this case, is the fact that the peculiar nature of the district court's factual findings where it didn't actually resolve the government's position about loss at the sentencing. And the courts leave to the parties to further develop the restitution record as 3664 D-5 permits so that they occur at two different time points. I think that also takes this case out of the facts and circumstances of Dovich. Do you read Dovich as saying that notwithstanding the language that it can never exceed the amount involved in the sentencing, that it actually can if you've got different factual circumstances that have come in and the defense doesn't object to it? Yeah, I think that's—I agree with that summary, Your Honor. And you think that's what happened here? Yes. I think the district court— with the record that it had provided by the government and with very generic and non-objections without specific efforts by the defendant to contest individual loans on that sheet. If the defense wanted to have a hearing, wanted the government to present the underlying records, we could have a more granular dispute about any of the loans on the government's affidavit. And that didn't happen because the defense didn't really raise that issue. They rested primarily on their argument that they should only be hit with losses that they personally incurred. And Riley forecloses that argument. So there are three minutes left. I know the panel's a long docket. The defendants have raised a number of other objections. Before I sit down, I'll just want to clarify one thing on the sentence, Arthur's sentence. The government has conceded that the district court should have invited allocution. And just to respond to something in the reply brief, our view of what should happen on remand is Arthur's sentence should go back. Arthur should be allowed to allocute. If Arthur offers anything during allocution that the district court credits as mitigation, the district court would have the discretion to rejigger its 3553A considerations and reduce Arthur's sentence if there's something— So you're arguing essentially for a limited remand. Yes. What we object to is the defense request that we go back and do everything all over again, all the guidelines, disputes, the ones that are on appeal, the ones that are not, on an open record, and just start from scratch. Unless the court has any other questions about the sentencing claims here, our view is there's only one error at sentencing, that was the allocution, and the nature of the remand should reflect that. I'm sorry, go ahead. Could he put in further mitigating evidence, letters from family and friends on a resentencing? Yeah, I think that would be fair, and I don't think the government would object. The remedy should put him back in that position to where he was where the district court should have invited him to allocute. What about changed circumstances? He now has a health condition that he didn't have before. Could that be consented by the district court? I think the Supreme Court says that in these types of hearings, if there's some intervening facts, that would be an appropriate consideration for Arthur to discuss in his allocution. Well, that's more of a full resentencing, isn't it? No, I guess maybe I misunderstood your question. I think Arthur is allowed to talk about facts and circumstances that he has experienced after the initial sentencing in this case, but not have a full blown if there's any. In addition to the allocution issue, do I understand correctly that in Vahie's case you also concede that this should be a joint and several liability? Yes. Is that correct? Yes. So that also needs to be corrected. Yeah, so we cited an unpublished decision in Wilkins where the record was clear and this court decided there's no need given the clarity of the record, but the government doesn't have an objection for a narrow remand to go back and just amend or clarify his final judgment to say his restitution obligations should run jointly and separately. Okay. Unless there are any other... Other questions about my colleague? I think not. Thanks. The government asks that you affirm on the convictions and everything else subject to the remand so that we just discussed. Very well. Thank you. Okay. So we have two opportunities for rebuttal. Well, first as to Delkish, even though it says the restitution cannot exceed the loss in the sentence, it doesn't mean that it has to equal that. So that's one thing here. And there was an objection in this case. The trial attorney objected to the guideline calculation of the government and the judge's calculation. He also objected to the restitution. Unlike in Delkish, the lawyer did not object to anything, and it was only on plain error that the Delkish court evaluated the issue. But the nature of the objection was that he should only be held accountable for his individual loans. That's correct, and I think that's sufficient. Why? Think about it. The government submits a lengthy spreadsheet with all different kinds of banks and loans, and his name, Vahey Dadian, is mentioned once. Why isn't it sufficient for the defense attorney to say he's limited to that particular ---- Well, that's an argument you can make, but then you didn't go forward and say even if you hold him accountable for all of the loans pursuant to the conspiracy, that on line 49, that loan didn't have anything to do with the conspiracy. Line 56, that loan didn't have anything to do with the conspiracy. You didn't make that alternative argument, correct? No, he did not do that, but he did file a rule 29 motion, a motion for a new trial, and argued that what was reasonably foreseeable to him in terms of the conspiracy, you know, was the conspiracy convictions were insufficient. I think that's enough. I don't think you need to go through. I mean, they would have been there for days going through that whole thing. And the other thing is, just last minute thing, the government says that Mr. Dadian was aware of everything else because of the money was transferred to with this Runyon tax service, and then he got money from this timeline transfer. There was no evidence whatsoever that he was aware that these were phony businesses, or that there was anybody else involved, or anything about the other conspirators. Very well. Thank you very much. All right. Ms. Young, you've got some rebuttal time as well. Thank you, Your Honor. I'll be very brief. I just wanted to touch on, I think, two issues. First of all, with respect to the aggravated identity issue, the prosecutor argued Pinkerton liability. But with respect to the aggravated ID, the requirement is that the defendant himself must know that. So it's not really a case of Pinkerton liability. He must know that. But the government argues that he did, based upon what – I won't try to repeat what he said. But isn't that enough? If he's correct, isn't that enough? I don't think – well, I've already made the arguments about what's on his phone. But I don't think even so, just because there were multiple driver's licenses, that doesn't tell him that they are real people in the driver's licenses. There's nothing in there that tells him. But they were used as part of the conspiracy anyway. Okay. I'll move on to Dokich. In Dokich, there was no objection at all. Here there was an objection. There was an objection beyond the objection that it exceeded the scope of the defendant's role in the conspiracy. There was also an objection to the fact that there was no documentation supporting the loans were fraudulent or how they were connected to the conspiracy. Where was that objection made? It was made on ER 134 to 135, and it's discussed in the opening brief on page 54. And was there any further questions? I think not. Thank you, Your Honor. Thanks to all counsel. I know this is a big, challenging case, but we thank you for your argument, preparation. The case just argued, United States v. Dodd-Young et al. is submitted.
judges: SMITH, DESAI, Amon